594 So.2d 951 (1992)
The ANMAC FOUNDATION INC., Plaintiff-Appellee,
v.
ST. PATRICK HOSPITAL OF LAKE CHARLES.
Elliot BUSHNELL
v.
ST. PATRICK HOSPITAL, Defendant-Appellant.
No. 90-812.
Court of Appeal of Louisiana, Third Circuit.
February 12, 1992.
*952 Steven C. McGinity, Lake Charles, for plaintiff-appellee ANMAC.
Cynthia Guillory, Lake Charles, for plaintiff-appellee Bushnell.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Robert Clements, Lake Charles, for defendant-appellant St. Patrick Hosp.
Before DOUCET, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
St. Patrick Hospital appeals a trial court verdict which found it liable for damages Elliot Bushnell received when he slipped and fell in the hospital. A jury determined Bushnell's claim against St. Patrick, and the trial judge adjudicated the claim of the ANMAC Foundation, Bushnell's employer, for reimbursement of worker's compensation and medical benefits. The jury awarded Bushnell $90,000 damages, and the trial judge granted judgment in favor of Bushnell's employer, the ANMAC Foundation, awarding it reimbursement of $26,675.81 from Bushnell's damage award for worker's compensation benefits it paid.
St. Patrick appeals, contending that: (1) the jury and the trial judge erred in concluding that the hospital was guilty of negligence which was a proximate cause of the accident; and, (2) that the jury awarded an excessive amount of damages.

FACTS
ANMAC is a foundation which provides patient services to severely disabled individuals. In connection with this activity, *953 ANMAC employed Bushnell to transport these patients to tutoring sites. St. Patrick Hospital provided office space for ANMAC's staff to tutor individuals brought for training.
Shortly before nine o'clock a.m. on October 3, 1986, Bushnell transported a patient to ANMAC's office at St. Patrick. After leaving the patient at the ANMAC office, Bushnell exited, and slipped and fell as he walked down the hallway of St. Patrick, striking his leg against the metal doorjamb as he fell.
Bushnell was treated in the emergency room of St. Patrick shortly after the fall for a laceration to his shin. Later that same day, Bushnell returned to the emergency room and complained of lower back pain. At the time of trial, Bushnell had not returned to work because of neck and back pain.

SLIP AND FALL: MANIFEST ERROR
St. Patrick first contends that the jury and the trial judge were manifestly erroneous in their determination that the hospital was at fault and that this fault was the legal cause of Bushnell's injuries.
Under Louisiana law when a plaintiff proves he slipped and fell in a hospital on a foreign substance or on a wet, damp or slippery floor, the burden shifts to the defendant to exculpate itself from the presumption that it was negligent. Scott v. Hosp. Service Dist. No. 1, 484 So.2d 168 (La.App. 5th Cir.1986), reversed on other grounds, 496 So.2d 270 (La.1986). The hospital must establish that it was free from fault and that it exercised reasonable care to protect visitors from foreign substances on the floor. Id. A hospital has a duty to exercise reasonable care to protect those who enter the premises. This duty extends to keeping the premises safe from unreasonable risks of harm and to adequately warn potential victims of the existence of the danger. Perkins v. Springhill General Hospital, 278 So.2d 900 (La.App. 2d Cir.1973); Bordelon v. Southern La. Health Care Corp., 467 So.2d 167 (La.App. 3rd Cir.1985), writ denied 469 So.2d 989 (La.1985).
In the case sub judice, because of the consolidation of Bushnell's claim for damages with ANMAC's action for reimbursement, the jury and the trial judge were both triers of fact. The trier of fact must evaluate the credibility of witnesses and make factual determinations. Where its finding is not manifestly erroneous, the appellate court may not disturb it even though its evaluation may be equally reasonable. Carollo v. Shoney's Big Boy Enterprises, 433 So.2d 803 (La.App. 5th Cir. 1983), writ denied 441 So.2d 213 (La.1983).
St. Patrick first argues that Bushnell staged his fall. In making this assertion, St. Patrick relies on Bushnell's alleged inconsistent assertions regarding the origin of the dampness on the hallway floor. St. Patrick states that Bushnell thought at one point that the dampness originated from a leak in pipes located in the ceiling, and later that the source of the dampness was a spill on the floor. Without going into detail of this argument, we note that the jurisprudence places no burden on the claimant to show how the foreign substance got on the floor, only that a foreign substance was on the floor. Accordingly, we find no merit to St. Patrick's argument, and proceed to analyze the fact finders' determination that a foreign substance or a wet, damp or slippery hospital floor caused Bushnell to fall and injure himself.
St. Patrick next argues that Bushnell provided no corroborating evidence that a foreign substance was on the floor where he fell.
The record shows that at approximately the same time that Bushnell arrived at St. Patrick, the maintenance crew leader of the hospital staff on duty, Shirley Jean, received a call from another employee, reporting a liquid spill in the hallway outside the ANMAC office at the hospital. When she was unable to get assistance, Jean testified that she got a mop, dampened it, and proceeded to the spill. She did not bring a bucket or wet floor signs with her.
Jean stated that she found approximately eight small puddles of a greenish-brown jellied substance on the hallway floor, but that none were located at the corridor door; each puddle was more or less the size of a *954 half-dollar. She said that she used the wet mop to wipe the puddles she saw, and carried the mop with the jellied substance on it up to the corridor where Bushnell fell. After she saw no other spills, she retraced her steps and returned by elevator to her office.
Bushnell stated that when he walked to the ANMAC office, he saw no one in the hallway. He said that when he brought the patient into the ANMAC office, he chatted for a few minutes with the ANMAC employees and proceeded to return to his van. However, he said that when he got to the corridor door he slipped and hit the doorjamb and then the floor. After he struck the floor, he looked down the hallway and saw a woman walking away with a mop in her hand. Although he stated that he called out to her, the woman with the mop proceeded onto the elevator. Bushnell further said that he then felt the floor and his clothes, and found them both damp.
After reading the record, it is evident that the fact finders were presented with conflicting testimony on the threshhold issue of whether a foreign substance or a wet, damp or slippery floor existed where Bushnell fell. Where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990).
St. Patrick stresses that although there was a conflict in the testimony, the fact finders should have been swayed by the testimony of Glenda Finkley and Jill Leger, Bushnell's co-employees at the ANMAC office at St. Patrick. At trial they testified that they found no moisture on the floor where Bushnell fell. Even with this testimony, we do not find that the fact finders were precluded from making a factual determination in favor of Bushnell. Neither of these persons witnessed Bushnell's fall. Moreover, Finkley's testimony interjected an additional conflicting fact, i.e., there was variance between Finkley's location of the place of the fall and that established by Bushnell. Lastly, the record further shows that there was a lapse of time, maybe as much as five minutes, between the time of the accident and Finkley's arrival, and that Leger's arrival was even later.
Accordingly, after carefully considering the totality of the evidence adduced before the jury and the trial judge, we find no manifest error in their determination that a foreign substance or a wet, damp or slippery floor existed which caused Bushnell's fall. Therefore, the burden shifted to St. Patrick to exculpate itself from the presumption that it was at fault.
After carefully reviewing Shirley Jean's testimony, it cannot be said that the jury and the trial judge erred in finding that the hospital failed to exculpate itself from fault. Jean testified that she did not take a bucket with her, and that she carried the wet and soiled mop dangling in the air as she walked along the hallway. She likewise stated that she did not post wet floor signs to warn visitors. Instead, without manually checking the floor, she relied on her judgment that the hallway floor was dry. Accordingly, we find no manifest error in the jury's determination that St. Patrick failed to exculpate itself from fault, and therefore was liable for Bushnell's damages which resulted from his slip and fall.

DAMAGES
St. Patrick next contends that the jury's award of $90,000 damages to Bushnell for a laceration to his shin and a lumbar strain was excessive.
St. Patrick does not contest the $17,944.58 ANMAC paid for Bushnell's medical treatment. Instead, it focuses on the extent of Bushnell's injury and attacks any award made by the jury for loss of wages for more than one year after Bushnell's slip and fall.
It is well settled that in reviewing damage awards the appellate court is not to decide what it considers an appropriate award on the basis of the evidence, but only to review the exercise of the trier of facts' discretion. Collins v. Natchitoches Parish Hosp., 493 So.2d 902 (La.App. 3rd Cir.1986), writ denied, 496 So.2d 1041 (La. 1986). Before an appellate court can disturb *955 a jury's award of damages, the record must clearly show that it abused its discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
In the present case, the trial court did not utilize special verdicts or interrogatories itemizing the elements of damages. We stated in Taylor v. Dupree, 484 So.2d 986, 989 (La.App. 3rd Cir.1986), writ denied, 488 So.2d 201 (La.1986):
"A lump sum judgment of damages is presumed to award all items of damage claimed, and the appellant's burden of proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir.1983), writs denied, 433 So.2d 1056, 1057 (La.1983). When a general verdict has been used, each case must be analyzed on its own facts and circumstances, and each element must be examined to determine whether the jury committed manifest error. Washington v. Lake City Beverage, Inc., 352 So.2d 717 (La.App. 3rd Cir.1977), writ denied, 354 So.2d 1050 (La.1978).
The jurisprudence has established that plaintiff must prove the damages in a tort case by a preponderance of the evidence. Green v. Superior Oil Co., 441 So.2d 54 (La.App. 3rd Cir.1983). Proof sufficient to constitute a preponderance must establish that the fact sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971)."
Bushnell sought damages in his petition for physical pain and suffering, mental anguish, disability, past and future, loss of future earnings, as well as future inability to function as he did prior to the accident, and past and future medical expenses.
Bushnell was twenty-one years of age at the time of the accident. Initially he was seen by Dr. Howard M. Rigg in the emergency room at St. Patrick; there his shin laceration was sutured. Later that day Bushnell returned to St. Patrick complaining of low back pain. Two days later he returned with the same complaints.
Dr. Paul Comeaux, Bushnell's family physician, admitted him to Lake Charles Memorial Hospital, and referred him to Dr. Dennis Walker, an orthopedic surgeon.
Dr. Walker examined Bushnell for the first time in the hospital on October 10, 1986, one week after the accident. Bushnell complained of pain in the low back, predominantly on the left side, with pain radiating into the left buttock and thigh. After reviewing x rays and a CAT Scan, both of which were normal, Dr. Walker's diagnosis was that Bushnell had a low back strain. After discharging him from the hospital, Bushnell began physical therapy which lasted about one month. Dr. Walker next saw Bushnell on November 11, 1986. His complaints were the same, except that he also now complained of neck pain and headaches. Cervical x rays taken at that time were normal.
Before Bushnell's next visit with Dr. Walker on November 21, 1986, a MRI study of the cervical spine was conducted. Dr. Walker testified that the MRI showed a bulging C-5-6 disc with early degenerative changes at that level as well as at C-4-5. He thought that the degenerative changes pre-dated the accident. Based on the history Bushnell provided and the medical tests conducted, Dr. Walker opined that the accident caused Bushnell's low back pain and the degenerative changes in the cervical region were made symptomatic by the fall at St. Patrick.
Bushnell was next referred by his employer, ANMAC, to Dr. Dale Bernauer, an orthopedic surgeon. Dr. Bernauer examined Bushnell for the first time on February 26, 1986, and became Bushnell's treating physician. Bushnell complained of back pain radiating into both legs, and neck pain. Dr. Bernauer initiated physical therapy and scheduled a cervical myelogram on April 7, 1987. The myelogram revealed slight pressure on the nerve at the C-5-6 level, but did not support a conclusive diagnosis of a herniated disc. Spinal headaches caused by the myelogram required Bushnell's brief rehospitalization.
On May 11, 1987, Bushnell told Dr. Bernauer that he felt better and that the pain *956 was decreasing. However, because of the persistent neck and low back pain, Dr. Bernauer continued conservative treatment.
At Bushnell's next examination on June 1, 1987, Bushnell complained of bilateral leg pain and some neck pain. Repeat x rays of the lumbar spine showed no changes and a MRI was normal. An EMG of Bushnell's arms done on June 17, 1987, produced normal results, and on June 29, 1987, Bushnell was referred to Dr. William Foster, a neurosurgeon, for further evaluation of the neck pain. Dr. Foster opined that Bushnell was suffering from a cervical and lumbar contusion. Dr. Foster also felt that Bushnell had developed a functional component to his pain, i.e., the degree of pain is magnified because of the long period of time it has been endured.
On August 14, 1987, a physical therapist ran a functional capacity test as requested by Dr. Bernauer. Bushnell was then sent to "back school", a physical therapy modality where he was taught how to lift, stand correctly, and try to rehabilitate the back. Despite these therapeutic interventions, Dr. Bernauer noted that as of September 30, 1987, Bushnell was still complaining of pain.
A MRI of the neck done on October 6, 1987, showed degeneration of the disc at C-5-6, but the herniation previously indicated was not shown. Dr. Bernauer could not explain this latter finding, but noted that herniated discs do not spontaneously realign themselves.
As of December 2, 1987, Dr. Bernauer testified that Bushnell still complained of neck and low back pain. Because of the chronic pain Bushnell suffered, Dr. Bernauer started him on a home traction routine.
On January 11, 1988, Bushnell complained to Dr. Bernauer of neck and low back pain with no improvement.
Dr. Bernauer continued conservative treatment of Bushnell until January 19, 1988. At that time, Bushnell was released to do light duty work. Dr. Bernauer's instructions were that Bushnell should not lift more than 25 pounds, and that he should not do any stooping, crawling or bending. Dr. Bernauer stated that Bushnell had a low tolerance for pain and that he was not a malingerer. Dr. Bernauer's final diagnosis on February 10, 1988, was that Bushnell suffered a cervical and lumbar strain, that he was still complaining of pain and that surgery was not necessary.
Initially we examine Bushnell's claim for loss of wages between the time of the accident and the date of trial. Although there was no prayer for damages for loss of wages, Bushnell presented evidence of such a loss without objection by St. Patrick. When evidence otherwise inadmissible because it was not pleaded is admitted without objection, such evidence establishes that the party is allowed to seek this award on the ground that the opposing party has impliedly consented to the enlargement of the pleading to include the increased demand. Sterkx v. Gravity Drainage Dist. No. 1 of Rapides Par., 214 So.2d 552 (La.App. 3rd Cir.1968), writ refused, 252 La. 964, 215 So.2d 130 (1968). Therefore, since St. Patrick did not object to testimony of Bushnell's loss of wages until the time of trial, we shall consider the pleadings enlarged to this extent.
Allen G. Simmons, a vocational rehabilitation specialist, testified that Bushnell's loss of wages until the time of trial, a period of 3.4 years, totaled $40,000. Because we do not know what amount the jury awarded, we must evaluate the award, assuming it awarded the maximum and take into account St. Patrick's contention that Bushnell was not allowed to recover wages after he was discharged by Dr. Bernauer.
The burden is on the plaintiff to prove that he has suffered a loss of income. Carter v. State Farm Mut. Auto. Ins. Co., 548 So.2d 53 (La.App. 3rd Cir.1989). Accordingly, we have held that a plaintiff must prove the length of time he missed work due to the accident. Rougeau v. Commercial Union Ins. Co., 465 So.2d 178 (La.App. 3rd Cir.1985).
Bushnell testified that he has not been employed since his accident at St. Patrick. The only work he said he performed since the accident was that he helped his aunt in California by working sometimes at the cash register in her restaurant. No details *957 were adduced about how long he did this. The only other relevant testimony about Bushnell's inability to work was provided by Simmons, the vocational rehabilitation expert. He testified that Bushnell was unable to return to work at ANMAC and at the restaurant in Lake Charles where he was a waiter because both of those jobs required medium to heavy lifting. Under Dr. Bernauer's discharge, Bushnell could only do light duty work. No testimony was adduced about other light duty work which may have actually been available to Bushnell, or whether Bushnell even sought employment within his medical limitation.
Based on this evidence, we do not find that St. Patrick's argument has merit. The jury heard Bushnell's testimony of severe pain until 1989 and a leveling off thereafter, as well as Dr. Bernauer's severely restrictive medical discharge to return to light duty work. Accordingly, we cannot say that the jury erred in finding that Bushnell was unable to return to work as of the time of trial due to the accident at St. Patrick. Therefore, the jury could have been justified in awarding the $40,000 maximum for loss of wages as of the time of trial.
On the other hand, we find, after carefully reviewing the record, that there was no evidence that Bushnell was entitled to an award for the future loss of wages other than the testimony of Simmons, the vocational rehabilitation specialist. Simmons testified that without a three year period of remediation, Bushnell would suffer a loss of earning capacity of $3,000 yearly. No economist testified about Bushnell's work life expectancy, and there was no medical testimony that Bushnell could not return to work in the future, only that he was restricted to light duty work. Accordingly, we find that the most the jury could have awarded Bushnell for loss of earning capacity was $9,000.
The last item of damages was Bushnell's general damage award. Based on the medical expenses awarded ($17,565), the loss of wages up to the time of trial ($40,000), and Bushnell's $9,000 loss of earning capacity, we approximate the jury's general damage award at $27,000.
Bushnell testified that his back and neck initially hurt constantly and that the pain would often prevent him from sleeping. This intensity of pain persisted until 1989; since then Bushnell testified that he still suffers from pain but that it has gradually decreased.
As of the time of trial, Bushnell stated that he was still in pain. He further elaborated that he has not taken pain medication since he last saw Dr. Bernauer because he was told by the doctor that the medication was addictive and would only temporarily relieve the pain. He said that he also has not sought medical attention since his discharge because he was told that he would experience pain for some time and that he would have to learn to deal with it daily until it was over.
Bushnell further stated that he can no longer swim, play softball or baseball, bowl, or participate in any sports like he did prior to his accident. He said that sitting or standing for any duration of time is uncomfortable.
Based on the extensive medical record detailed hereinabove and Bushnell's testimony of the pain he was enduring, we cannot say that the jury abused its discretion in assessing general damages of approximately $27,000.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to St. Patrick Hospital.
AFFIRMED.